2001-NMCA-108

37 P.3d 107

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Leslie Eugene ELLIOTT, Defendant–Appellant.**

**No. 21,463.**

Court of Appeals of New Mexico.

Oct. 26, 2001.

Certiorari Granted, No. 27,207, Dec. 7, 2001.

Patricia A. Madrid, Attorney General, Santa Fe, NM, M. Anne Kelly, Ass't Attorney General, Albuquerque, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Trace L. Rabern, Ass't Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Defendant appeals from the judgment and sentence imposed after he was convicted by a jury of felony failure to appear, contrary to NMSA 1978, § 31–3–9 (1973, prior to 1999 amendment). Defendant raises five issues: (1) whether the jury instructions were flawed insofar as they omitted an element of the offense, improperly shifted the burden of proof to Defendant, and confused the jury; (2) whether the original trial judge's testimony that he had not excused Defendant's tardiness, and the prosecutor's use of this testimony during closing arguments, directed the jury to convict Defendant; (3) whether Defendant's conviction violated his right to be free from double jeopardy given that Defendant was held without bond for eight months prior to trial; (4) whether Defendant's nine-and-one-half year sentence constitutes cruel and unusual punishment; and (5) whether the trial court erred in finding that a prior conviction from Arizona was a valid felony conviction for purposes of sentencing Defendant as a habitual offender. We affirm.

## BACKGROUND

{2} Defendant was scheduled for a felony jury trial on November 25, 1998. Trial was scheduled for 8 a.m. It was disputed whether Defendant's attorney told Defendant that trial was set for 8 a.m. or whether Defendant was just informed that the trial was set and assumed that it was set for 9 a.m., just as other hearings had been. Defendant, dressed for court, left his house and went to his place of business, which he was running in his father's absence. He had a few things he needed to take care of. He returned home and picked up his wife and family at about 9:15 a.m. At that point, a deputy sheriff was waiting for him, having been dispatched by the judge to see if Defendant could be found or needed a ride to court.

The deputy followed Defendant and his family to the courthouse, where Defendant was arrested for failure to appear. The deputy's affidavit for the arrest warrant states, "Upon arrival at the courthouse ... [D]efendant said that he knew he was late for court but that something came up."

{3} At 8:30 a.m., the trial judge had become aware of Defendant's absence. Defense counsel told the judge that Defendant had notice that trial began at 8 a.m. and that trial counsel expected Defendant to appear. At 8:45 a.m., the judge told the jury that the trial was delayed and that he expected the delay to last as long as forty-five minutes. Around the same time, the judge dispatched the deputy to look for Defendant. The deputy called the judge at approximately 9 a.m. to say that Defendant mistakenly believed that the trial began at 9 a.m. and that Defendant's wife believed that Defendant was en route to the courthouse. The judge decided to give Defendant an extra fifteen minutes to appear before the judge would dismiss the jury. When Defendant failed to appear by 9:17, the judge dismissed the jury and issued a bench warrant for Defendant's arrest. One minute later, the deputy called to say that Defendant had returned home and was now on his way to the courthouse. The judge told the deputy that the jury had been dismissed and instructed the deputy to arrest Defendant upon his arrival at the courthouse.

{4} A jury found Defendant guilty of failure to appear, contrary to Section 31–3–9(A). A supplemental information charging Defendant with three prior felony convictions was filed, and after a hearing, the court found that all three prior convictions had been proved. The court sentenced Defendant to a nine-and-one-half year term, consisting of one and one-half years on the conviction for failure to appear and a mandatory eight-year term on the habitual offender information. The court suspended the one-and-one-half year term on the failure to appear conviction and ordered one year of mandatory parole supervision with a concurrent one-year probation upon completion of the incarceration. Defendant was also given credit for a presentence confinement of eight months.

## DISCUSSION

### Issue One: The Jury Instructions Were Proper

{5} Defendant raises three challenges to the jury instructions: (1) the instructions given were confusing and improperly shifted the burden of proof to Defendant, (2) the court erred in refusing Defendant's tendered instruction requiring a finding of deliberate will to thwart the judicial process given that the legislature intended that the failure to appear statute apply only to people who abscond from the jurisdiction or who otherwise attempt to deliberately thwart the judicial process, and (3) the instruction defining "willfully" improperly set forth a civil rather than criminal standard, thereby violating *State v. Magby*, 1998–NMSC–042, ¶ 17, 126 N.M. 361, 969 P.2d 965, *overruled on other grounds by State v. Mascareñas*, 2000–NMSC–017, ¶ 27, 129 N.M. 230, 4 P.3d 1221, and *State v. Padilla*, 1997–NMSC–022, ¶¶ 2, 4, 123 N.M. 216, 937 P.2d 492. We conclude that the instructions as given were proper.

{6} The applicable uniform jury instruction sets forth the elements of the crime of failure to appear as follows:

> For you to find the defendant guilty of failure to appear as required by conditions of release ..., the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. _____ (*name of defendant*) was released pending [trial] [an appeal] in a criminal action on the condition that _____ (*name of defendant*) appear as required by the court;
>
> 2. _____ (*name of defendant*) failed to appear as required by the court;
>
> 3. The defendant's failure to appear was willful, without sufficient justification or excuse[.]

UJI 14–2229 NMRA 2001; *see also* § 31–3–9. The jury in the case at bar was instructed as follows:

### INSTRUCTION NO. 4

For you to find the Defendant guilty of Failure to Appear, the State must prove to your satisfaction beyond a reasonable

doubt each of the following elements of the crime:

1.   The Defendant was released pending trial in *State of New Mexico vs. Leslie Elliott*, San Juan County cause No. CR 98–95–1.

2.   The Defendant willfully failed to appear before the court as required.

. . . .

### INSTRUCTION NO. 5

"Willfully" denotes the doing of an act without just cause or lawful excuse.

In addition, the jury was given a general intent instruction at Defendant's request, and over the State's objection. *See* UJI 14–141 NMRA 2001.

■   {7}  Defendant argues that the instructions as given were confusing because the definition of willfully was contained in a separate instruction, as opposed to being in the elements instruction.  Not only did Defendant fail to make this argument below, but Defendant's proposed instructions likewise included a separate instruction defining willfulness.  For this reason, we need not consider Defendant's argument on appeal. *See State v. Varela*, 1999–NMSC–045, ¶ 11, 128 N.M. 454, 993 P.2d 1280 ("Ordinarily a defendant may not base a claim of error on instructions he or she requested or to which he or she made no objection."); *State v. Santillanes*, 2000–NMCA–017, ¶ 17, 128 N.M. 752, 998 P.2d 1203, *rev'd on other grounds*, 2001–NMSC–018, 130 N.M. 464, 27 P.3d 456.  Even if we were to consider Defendant's argument, however, we would hold that giving the separate definition instruction was not error on the grounds that the elements instruction did expressly contain the element of willfulness, and the definition immediately followed the elements instruction, such that the jury was properly instructed on the burden of proof. *See State v. Sosa*, 1997–NMSC–032, ¶ 29, 123 N.M. 564, 943 P.2d 1017 (rejecting the defendant's argument that failure to include definition of self defense within elements instruction was error).

{8}  Defendant next argues that the jury instructions were confusing in that they required the jury to find a "double negative,"

namely that Defendant failed to act without excuse or justification, and did not properly inform the jury of the act for which Defendant was being convicted.  In our view, the jury instructions were virtually identical in all material respects to the approved UJI, with the exception of the separate definition instruction.  The act for which Defendant was convicted was the same act as that required by the statute and the UJI—that Defendant failed to appear as required by the court.  In addition, as discussed more fully below, the jury was properly instructed regarding the need to find that Defendant's failure to appear was both intentional and willful.

■   {9}  At this point, it is worth noting our disagreement with the State's position below—that no general intent instruction need be given for failure to appear.  Use Note 1 to UJI 14–141 states that the general intent instruction must be given except if the crime contains no intent requirement or if the intent requirement is otherwise specified in the statute or instruction.  We acknowledge that willfulness, as set forth in the statute and instruction, is an intent requirement.  However, our case involves arguable carelessness.  The general intent instruction correctly informs the jurors that to find Defendant guilty of this crime, they must find that Defendant acted intentionally.  Defendant could not be convicted for an act of mere carelessness where he had no intent to fail to appear.  Thus, an instruction solely on willfulness (defined as the absence of just cause or excuse), without the addition of language on intent, would not adequately apprise the jurors of what they needed to find.

{10}  The crux of Defendant's challenge to the jury instructions is his contention that the trial court erred in refusing his tendered instruction defining "willfulness."  Defendant argues that his instruction properly informed the jury that it needed to find not only that Defendant acted without lawful excuse or just cause, but also that, in failing to appear as required, Defendant intended to thwart the legal process.  We disagree that the jury was required to make such a finding.

{11} Defendant tendered two alternate instructions defining the element of willfulness:

### DEFENDANT'S PROPOSED INSTRUCTION NO. *1*

For you to find that the defendant acted "willfully", you must find that he intentionally decided to not go to court as a result of careful thought and planning. Showing up late for court does not constitute a willful failure to appear, if you find that the defendant intended to go to court on the morning in question.

. . . .

### DEFENDANT'S PROPOSED INSTRUCTION NO. *1a*

For you to find that the defendant acted "willfully", you must find that he intentionally decided to not go to court as a result of careful thought and planning.

Defendant's two instructions were adaptations of UJI 14–201 NMRA 2001, which sets forth the elements of willful and deliberate murder. *See id.* ("The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action.").

{12} We reject Defendant's contention that the offense of failure to appear requires a finding that a defendant's failure to appear was accompanied by an intent to abscond or to thwart the legal process. Failure to appear contrary to Section 31–3–9 is not a specific intent crime. The hallmark of a specific intent crime is the intent to do a further action or achieve a further consequence. *State v. Baca,* 1997–NMSC–059, ¶ 51, 124 N.M. 333, 950 P.2d 776. The crime of failure to appear does not require any intent to do a further action or achieve a further consequence. In this regard, it is materially different from the crime involved in the case on which Defendant places primary reliance, *State v. Rosaire,* 1997–NMSC–034, ¶¶ 7, 11, 123 N.M. 701, 945 P.2d 66. That case involved escape from an inmate-release program, which requires, in addition to the defendant's acting willfully, that the defendant act "with the intent not to return" to the designated place of confine-

ment. *Id.* ¶ 4 (internal quotation marks and citation omitted). The language "with the intent not to return" is classic specific intent language-the intent to do a further action or achieve a further consequence, that is, not return. Such "with intent to" language is conspicuously absent from the failure to appear statute. Thus, that statute does not define a specific intent offense, and the only intent requirement is that the action be willful, as well as be performed with general criminal intent.

{13} *Rosaire* did adopt the definition of willful from *State v. Masters,* 99 N.M. 58, 60, 653 P.2d 889, 891 (Ct.App.1982), a failure to appear case. *Rosaire,* 1997–NMSC–034, ¶ 7, 123 N.M. 701, 945 P.2d 66. *Rosaire* states, quoting *Masters,* " 'Willfully' denotes the doing of an act without just cause or lawful excuse." *Rosaire,* 1997–NMSC–034, ¶ 7, 123 N.M. 701, 945 P.2d 66 (internal quotation marks and citation omitted). That very language was given to the jury as Instruction 5 in this case.

{14} Insofar as Defendant appears to be suggesting that a requirement analogous to the "intent not to return requirement" found in the escape from inmate-release program statute should be read into the failure to appear statute, we disagree. We do not read words into the statutes, particularly when the legislature has seen fit not to include them. *See State v. Gutierrez,* 102 N.M. 726, 730, 699 P.2d 1078, 1082 (Ct.App.1985) (stating that when statute makes sense as written, this Court does not need to read words into it). It is the role of the legislature to define crimes. *State v. Nuñez,* 2000–NMSC–013, ¶ 49, 129 N.M. 63, 2 P.3d 264. The legislature is presumed to have understood and intended the differences in the language of the failure to appear and the escape statutes. *See, e.g., State v. Sundeen,* 2001–NMSC–006, ¶ 1, 130 N.M. 83, 17 P.3d 1019; *compare* NMSA 1978, § 33–2–46 (1980) ("Any prisoner whose limits of confinement have been extended, or who has been granted a visitation privilege under the inmate-release program, who willfully fails to return to the designated place of confinement within the time prescribed, *with the intent not to return,* is guilty of a . . . felony.") (emphasis

added), *with* § 31–3–9(A) ("Any person released pending trial or appeal in any criminal action who willfully fails to appear before any court or judicial officer as required is guilty of a fourth degree felony, if he was released in connection with a felony charge."). We agree with the State that the legislature's failure to include a further intent, other than general intent and willfulness, evinces its decision not to require the specific intent advocated for by Defendant.

{15} Defendant's last jury instruction argument is that the instructions in this case violated the principles in *Magby* and *Padilla*. *Magby* held that the standard of negligence in child abuse cases is criminal, not civil, negligence. 1998–NMSC–042, ¶¶ 10–11, 126 N.M. 361, 969 P.2d 965. Defendant characterizes *Padilla* as reading into the battery upon a peace officer statute a requirement that the state show a meaningful threat to authority or actual harm from a defendant's conduct. *See Padilla*, 1997–NMSC–022, ¶ 2, 123 N.M. 216, 937 P.2d 492. These cases have no application here. In arguing that a greater mental state is required for felony conduct, Defendant ignores that the legislature has chosen the distinction between misdemeanor failure to appear and felony failure to appear, and that distinction depends on the degree of the crime in the proceedings at which the defendant failed to appear. If a defendant is charged with a felony and he willfully fails to appear, his conduct is deemed to be a felony by the express terms of Section 31–3–9, without any reference to any further heightened mental state.

{16} Our conclusion is supported by New Mexico case law and cases from other jurisdictions, which have upheld convictions for failure to appear where the evidence did not necessarily show a deliberate intent not to appear, but did show that the defendant intended to do the act that caused the nonappearance. *See, e.g., State v. Aranda*, 94 N.M. 784, 786, 617 P.2d 173, 175 (Ct.App. 1980) (upholding conviction where evidence showed that defendant had met with counsel several times prior to trial, counsel informed the defendant that it was absolutely necessary for him to appear, and the day before trial the defendant left for Albuquerque and made no effort to contact his attorney when his car broke down and he was unable to return in time for trial); *People v. Marquez*, 692 P.2d 1089, 1103–04 (Colo.1984) (en banc) (upholding conviction for failure to appear based on defendant's admission that he chose to travel to a funeral instead of appearing in court even though defendant appeared at court the next day), *overruled on other grounds by James v. People*, 727 P.2d 850, 855 (Colo.1986) (en banc); *State v. Hoover*, 54 Conn.App. 773, 738 A.2d 685, 687 (1999) (holding evidence sufficient where defendant claimed he was out of state visiting a friend at time of trial and mistakenly believed that the case had been continued); *Wilson v. State*, 776 So.2d 347, 349–50 (Fla.Dist.Ct. App.2001) (upholding conviction where defendant did not appear at the designated time for his trial and fled from the courthouse after being told that the court had issued a bench warrant despite the fact the defendant returned voluntarily two hours later); *Abdul–Musawwir v. State*, 483 N.E.2d 464, 465–66 (Ind.Ct.App.1985) (upholding conviction where defendant failed to appear at trial scheduled for 9:30 a.m., but arrived at courthouse at 3:30 p.m. on the same day and claimed that he was confused as to what time he was supposed to appear).

{17} In sum, the required mental state is that Defendant acted willfully and intentionally, concepts upon which the jury was expressly instructed. Defendant's tendered instructions were not correct statements of the law in that they told the jury that Defendant had to have carefully thought about not going to court and then have decided not to go to court at all or at least not to go to court on the morning in question. The manner in which the case was presented to the jury, based on the facts in evidence and through the instructions and argument, fairly gave the jury the opportunity to determine that Defendant knew when he was to be in court and chose to willfully and intentionally disregard the requirement to appear. We conclude that the trial court did not err in refusing Defendant's proposed instructions and that the jury was properly instructed.

## Issue Two: Testimony of Judge, Closing Arguments, and Jury Instructions Did Not Obligate Jury to Convict

{18} At trial, the State called Judge Thrower, the original trial judge who had ordered Defendant's arrest for failure to appear, as a witness. During direct examination, the judge and the prosecutor engaged in the following colloquy:

**Prosecutor:** At any time in the process of this case did you excuse the appearance of Mr. Elliott?

**Judge Thrower:** I did not.

**Prosecutor:** At any time in the course of the process of this case were you informed, before or after the warrant, of any just cause for him not appearing.

**Judge Thrower:** I was not.

{19} During closing arguments, the State referred to Judge Thrower's testimony as follows:

[A]s to willfulness, part of that's really easy. Willfully is defined for you as he does a thing without just cause or lawful excuse. The law in this case, the lawful excuse, would be Judge Thrower.

. . . .

As to willfully, you'll see the instruction, and it says, "without just cause or lawful excuse." [Judge] Thrower was the only one with lawful excuse and he didn't give it to him. Just cause. Even [Judge] Thrower would have accepted that his mother-in-law was something-I didn't quite catch it. We all laughed a little bit. [Judge] Thrower just wanted to hear something.

. . . .

Now, justifiable cause. Just cause. We've all talked about those things. Weather. Car failure. Illness. They're all kinds of justifiable cause. One of them isn't "I decided to go to work." Or one of them isn't "something came up." . . . [Defendant] said to the deputy, "I knew I was . . . I know that I'm late, but something came up." What, I don't know. . . . [T]here's no evidence here that it was anything that would be a justifiable cause other than that he went to the shop. And being at work instead of being here was his willful choice and his willful decision.

. . . .

Judge Thrower . . . was asked if at any time in this process he heard of anything that told him that . . . gave him some reason not to issue the warrant, and not to jail him.

{20} Defendant characterizes Judge Thrower's testimony as an opinion on the ultimate issue of whether Defendant's failure to appear was willful. Defendant argues that not only was this testimony improper, but the harm caused by the testimony was exacerbated by the State's use of the testimony during closing arguments and by the jury instructions. Defendant argues that, taken together, Judge Thrower's testimony, the closing arguments, and the jury instructions directed the jury to find that Defendant's conduct was willful. The State argues that Defendant failed to preserve his challenges to the testimony and the closing argument. We agree with the State.

{21} Defendant alleges that trial counsel made two objections to Judge Thrower's testimony. Our review of the record indicates that although defense counsel did object during the direct examination of Judge Thrower, the objections related to testimony regarding the consequences of Defendant's failure to appear, including both the cost of the jury and the conclusion that the jury members were precluded from sitting on any other case in which Defendant is a party. Our case law is clear that in order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon. *Varela*, 1999–NMSC–045, ¶¶ 25–26, 128 N.M. 454, 993 P.2d 1280. "In order to preserve an issue for appeal, 'it is essential that the ground or grounds of the objection or motion be made with sufficient specificity to alert the mind of the trial court to the claimed error or errors, and that a ruling thereon then be invoked.' " *Id.* ¶ 25 (quoting *State v. Lopez*, 84 N.M. 805, 809, 508 P.2d 1292, 1296 (1973)). There is nothing in the record to indicate that Defendant alerted the trial court to his allegations that Judge Thrower's testimony took an element of fact

away from the jury. Finally, Defendant concedes that he failed to object to the State's closing argument. As such, this argument is not properly before us. *See State v. Lucero,* 118 N.M. 696, 701, 884 P.2d 1175, 1180 (Ct. App.1994) (holding that a defendant bears the burden of objecting to an allegedly improper closing argument at the time the improper argument is made). In addition, we note that during Defendant's own closing argument, defense counsel referred to the challenged testimony to argue that Defendant's failure to appear was the fault of Judge Thrower, given that Judge Thrower testified that he would have accepted any excuse had he received one prior to dismissing the jury. Based on this testimony, defense counsel argued that had Judge Thrower waited an additional fifteen minutes before dismissing the jury, Defendant's tardiness would have been excused.

{22} Even if Defendant had properly preserved this issue, we would nonetheless affirm his conviction. While we agree that opinion testimony that seeks to state a legal conclusion is inadmissible, *State v. Clifford,* 117 N.M. 508, 513, 873 P.2d 254, 259 (1994), we disagree with Defendant's characterization of Judge Thrower's testimony as giving an opinion on the ultimate issue of Defendant's willfulness. Instead, Judge Thrower merely testified that he had not excused, and had not received an explanation for, Defendant's absence. Although Judge Thrower's testimony tended to establish the willfulness of Defendant's conduct, it did not rise to the level of removing an issue from the jury.

{23} In addition, the facts of this case are readily distinguishable from *Lytle v. Jordan,* 2001–NMSC–016, 130 N.M. 198, 22 P.3d 666, the case on which Defendant relies. In *Lytle,* the expert witness blatantly assumed the role of judge by advising the court on the proper application of the law to the specific facts of the case. *Id.* ¶ 49. The expert had been called solely for this purpose, to advise on the distinction between effective and ineffective assistance of counsel, which is a mixed question of fact and law, and to give her opinion that the facts of the case met the standard of ineffectiveness. *Id.* Under these circumstances, our Supreme Court rejected the expert's testimony. By contrast, Judge Thrower never gave an opinion as to whether Defendant's conduct was willful, but rather testified as to his interactions with Defendant and defense counsel on the day of trial. This testimony was proper.

{24} Similarly, we conclude that the State did not direct the jury to convict Defendant during closing arguments. The State's argument that Judge Thrower was the proper person to excuse Defendant's tardiness was legally accurate. Even if it was error for the State to argue that Judge Thrower was the only person authorized to excuse Defendant, the State also acknowledged its burden to prove that Defendant did not act with just cause and that Defendant intentionally and purposefully chose to deal with whatever came up at work rather than appear in court as required. *See State v. Bonham,* 1998–NMCA–178, ¶ 23, 126 N.M. 382, 970 P.2d 154 ("For error to be reversible, it must be prejudicial."). As such, we conclude that the testimony and closing argument did not constitute fundamental error.

{25} Finally, we agree with the State that the jury instructions, particularly the definition of willfulness, did not combine with the testimony and closing argument to direct the jury to convict Defendant. As discussed above, the jury was properly instructed that it needed to find that Defendant acted without just cause or lawful excuse and that Defendant's actions were intentional as well. *Cf. State v. Montaño,* 1999–NMCA–023, ¶ 18, 126 N.M. 609, 973 P.2d 861 (reversing conviction when instructions would not have informed jury that it was required to determine whether brick wall was a deadly weapon); *Bonham,* 1998–NMCA–178, ¶ 28, 126 N.M. 382, 970 P.2d 154.

**Issue Three: Defendant Was Not Subjected to Multiple Punishments**

{26} Defendant contends that he was twice put in jeopardy for the same crime when his bond was revoked in the underlying case and he was required to spend the next eight months in jail awaiting trial on the failure to appear charge and then when he was punished separately for the offense of failure to

appear. He attempts to analogize his claim of bond revocation and pre-trial detention to civil forfeiture pursuant to *Nuñez*, 2000–NMSC–013, ¶ 117, 129 N.M. 63, 2 P.3d 264. We are not persuaded.

▮ {27} The purpose of bail is to insure that a defendant appear for proceedings and sentence. *See State v. Cotton Belt Ins. Co.*, 97 N.M. 152, 154, 637 P.2d 834, 836 (1981). If a defendant released on bond fails to appear "at the time and place fixed by the terms of [the] bail bond," a court may issue a warrant for the defendant's arrest and may declare a forfeiture of the bond. NMSA 1978, § 31–3–2(B) (1993). In this case, there is no evidence that the trial court ordered a forfeiture of Defendant's bond. As such, the record is inadequate for us to consider Defendant's argument that the forfeiture of a bond under Section 31–3–2 raises double jeopardy concerns similar to those addressed in *Nuñez*. Instead, we discuss only whether revocation of Defendant's bond on the underlying charge and the subsequent pre-trial incarceration precluded the prosecution.

▮ {28} The revocation of a bond in response to a violation of bond conditions is not punishment, but is a regulatory or administrative action that insures the appearance of a defendant. *See United States v. Grisanti*, 4 F.3d 173, 175 (2d Cir.1993); *Wilcox v. State*, 748 N.E.2d 906, 911–12 (Ind.Ct. App.2001) (holding that bail revocation serves to "maintain[ ] the integrity of the judicial process and the authority of the courts, and protect[ ] the public from potentially dangerous persons"). The record indicates that Defendant was held without bond not only because of his failure to appear for trial, but also because of the severity of the three pending charges, and the possibility that, if convicted, Defendant would face an extensive prison term based on the habitual offender statute, combined to make Defendant a flight risk. The purpose of the revocation, therefore, was not to punish Defendant, but to insure his appearance at later hearings and trials. *See Nuñez*, 2000–NMSC–013, ¶ 62, 129 N.M. 63, 2 P.3d 264 (stating that whether a sanction is punitive or remedial is determined by looking at the purposes behind the statute authorizing the

sanction). Because the revocation served an administrative rather than punitive goal, we conclude that *Nuñez*, which was concerned with a decidedly punitive forfeiture statute, does not apply. *See id.* ¶ 94.

{29} Our conclusion is supported by decisions from other jurisdictions, which have consistently held that conduct that is the basis for revocation of bail may also be the subject of prosecution without violating the double jeopardy clause. *See Grisanti*, 4 F.3d at 175–76 (listing cases); *Wilcox*, 748 N.E.2d at 911–12; *Dorsey v. Commonwealth*, 32 Va. App. 154, 526 S.E.2d 787, 792 (2000). In addition, insofar as Defendant is asserting that he was subjected to multiple punishments, we note that Defendant was given credit for his pre-trial confinement. As such, even if the pre-sentence confinement in this case could be viewed as punitive, Defendant has failed to show that he was subjected to multiple punishments.

**Issue Four: Defendant's Sentence Does Not Violate the Prohibition Against Cruel and Unusual Punishment**

{30} Defendant claims that his sentence, which totaled nine and one-half years due to the felony nature of his failure to appear and his four felony convictions, amounted to cruel and unusual punishment. The State asserts that Defendant failed to preserve this issue by raising it below, and Defendant counters that his claim is excepted from the preservation requirement insofar as we are required to review de novo whether a sentence constitutes cruel and unusual punishment. We conclude that Defendant failed to preserve this issue. However, had Defendant properly challenged his sentence below, we would nonetheless hold that the sentence does not constitute cruel and unusual punishment.

{31} In *State v. Burdex*, 100 N.M. 197, 201, 668 P.2d 313, 317 (Ct.App.1983), we noted that constitutional claims of cruel and unusual punishment must be raised below to be reviewed on appeal. None of the cases cited by Defendant contradict this proposition. In *State v. Rueda*, 1999–NMCA–033, ¶ 8, 126 N.M. 738, 975 P.2d 351, the defendant preserved her challenge by arguing to the trial court that the mandatory habitual

offender enhancement violated both State and Federal constitutional law. *See also State v. Arrington,* 115 N.M. 559, 561, 855 P.2d 133, 135 (Ct.App.1993) (holding that a sentence of incarceration would constitute deliberate indifference to defendant's medical needs). Because Defendant has not indicated that he challenged the constitutionality of his sentence in the trial court, we conclude the issue is not preserved for our review. *See* Rule 12–216(A) NMRA 2001; *Burdex,* 100 N.M. at 201, 668 P.2d at 317.

{32} Were we to reach the issue, we would affirm on the grounds that our opinion in *Rueda,* 1999–NMCA–033, ¶ 6, 126 N.M. 738, 975 P.2d 351, is controlling and that Defendant has failed to point us to evidence of particular circumstances which would render imposition of the habitual offender enhancement cruel and unusual. *Cf. Arrington,* 115 N.M. at 561–62, 855 P.2d at 135–36 (holding that evidence of the defendant's medical condition and inability of correctional facility to provide necessary care sufficient to support finding that incarceration would be cruel and unusual).

{33} Nor are we persuaded by Defendant's argument that his nine-and-one-half-year sentence is grossly disproportionate to the sanctions imposed in civil cases involving litigants and attorneys who are late for court or who fail to attend depositions. *See, e.g., Sandoval v. United Nuclear Corp.,* 105 N.M. 105, 108, 729 P.2d 503, 506 (Ct.App. 1986). None of the attorneys or litigants sanctioned in the cases cited by Defendant were charged with crimes and therefore were not under the restrictions of a bond or court order to appear at dates and times under the penalty of the New Mexico statute governing failure to appear. Defendant in this case was.

**Issue Five: Trial Court's Finding, by a Preponderance of the Evidence, That Arizona Conviction Was a Felony Conviction Was Not Error**

{34} Defendant challenges the State's proof of one of his prior convictions, contending that it must be proved beyond a reasonable doubt under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and asserting that there was insufficient evidence under any standard to show a prior felony conviction. *Apprendi,* by its express terms, does not apply to prior convictions. *See id.* at 490, 120 S.Ct. 2348 (indicating that holding applies to facts "[o]ther than the fact of a prior conviction"); *see also United States v. Pacheco–Zepeda,* 234 F.3d 411, 414–15 (9th Cir.2001) (holding that *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), in which Supreme Court held it unnecessary to prove prior convictions beyond a reasonable doubt, is narrow exception to *Apprendi*).

{35} The standard of proof applicable to the establishment of a prior felony conviction for the purpose of a habitual offender enhancement under NMSA 1978, § 31–18–17(D) (1993), is preponderance of the evidence. *State v. Smith,* 2000–NMSC–005, ¶ 9, 128 N.M. 588, 995 P.2d 1030. At sentencing, the State bore the burden of making a prima facie case showing prior valid felony convictions, and Defendant then had the right to offer contrary evidence. *State v. Gaede,* 2000–NMCA–004, ¶ 8, 128 N.M. 559, 994 P.2d 1177.

{36} In assessing a claim of evidentiary insufficiency, this Court asks whether substantial evidence supports the court's decision. *See In re Ernesto M.,* 1996–NMCA–039, ¶ 15, 121 N.M. 562, 915 P.2d 318. Substantial evidence "is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *State v. Laguna,* 1999–NMCA–152, ¶ 7, 128 N.M. 345, 992 P.2d 896. This Court views the evidence in the light most favorable to the trial court's decision, resolves all conflicts, indulges all permissible inferences to uphold the court's decision, and disregards all evidence and inferences to the contrary. *Id.* We do not reweigh the evidence and will not substitute our judgment for that of the trial court. *Ernesto M.,* 1996–NMCA–039, ¶ 15, 121 N.M. 562, 915 P.2d 318.

{37} Defendant bases his challenge on the fact that possession of a dangerous drug is an "undesignated" offense under Arizona law. The relevant statute reads:

**Possession, use, administration, acquisition, sale, manufacture or transportation of dangerous drugs; classification**

A.  A person shall not knowingly:

1.  Possess or use a dangerous drug.

. . . .

B.  A person who violates:

1.  Subsection A, paragraph 1 of this section is guilty of a class 4 felony. Unless the drug involved is lysergic acid diethylamide, methamphetamine, amphetamine or phencyclidine or the person was previously convicted of a felony offense or a violation of this section or § 13–3408, the court . . ., considering the nature and circumstances of the offense, for a person not previously convicted of any felony offense or a violation of this section or § 13–3408 may enter judgment of conviction for a class 1 misdemeanor and make disposition accordingly or may place the defendant on probation in accordance with chapter 9 of this title and refrain from designating the offense as a felony or misdemeanor until the probation is successfully terminated. *The offense shall be treated as a felony for all purposes until the court enters an order designating the offense a misdemeanor.*

Ariz.Rev.Stat. § 13–3407 (1997) (footnote omitted and emphasis added).

{38} In this case, the State made its prima facie case by showing a prior conviction of a drug offense in Arizona that would be a felony if committed in New Mexico. Defendant's probation officer testified that the paperwork presented by the State showed that the offense for which Defendant was convicted was undesignated. In addition, the probation officer testified that Defendant had successfully completed probation. However, Defendant did not present an order designating the offense as a misdemeanor, nor did the State offer evidence that it searched the records and did not find such an order. Because there was conflicting evidence on the matter, it was for the trial court to resolve. *See Gaede,* 2000–NMCA–004, ¶¶ 8–9, 128 N.M. 559, 994 P.2d 1177. Based on the language of the applicable Arizona statute, *see* Ariz.Rev.Stat. § 13–3407(B)(1) ("The offense shall be treated as a felony for all purposes until the court enters an order

designating the offense a misdemeanor."), and the fact that neither the State nor Defendant presented an order designating the offense, we conclude that the evidence was sufficient to support the trial court's finding that the prior Arizona conviction was a felony for the purposes of the habitual offender enhancement.

**CONCLUSION**

{39} For the foregoing reasons, we affirm the judgment and sentence.

{40} **IT IS SO ORDERED.**

I CONCUR: M. CHRISTINA ARMIJO, Judge.

JONATHAN B. SUTIN, Judge (dissenting).

SUTIN, Judge (dissenting).

{41} I respectfully dissent in regard to Issue One. I would reverse Defendant's conviction.

{42} The trial court has age-old powers of contempt and bond revocation and concurrent powers to issue bench arrest warrants and to order incarceration when a defendant fails to appear on time for arraignment, trial, or sentencing. The Legislature did not likely intend Section 31–3–9 to be used to convict as a felon a defendant who fails to appear on time for and thereby delays or disrupts his arraignment, trial, or sentence hearing without substantial evidence beyond a reasonable doubt that the defendant intended to delay, disrupt, or thwart the proceeding.

{43} That intent was not required in this case. The majority correctly notes that Section 31–3–9 does not expressly set out that specific intent. The majority also correctly notes that the trial court gave the general intent instruction. Further, the majority correctly cites *Masters,* 99 N.M. at 60, 653 P.2d at 891, a failure to appear case, which defined the Section 31–3–9 element, "willfully," as denoting "the doing of an act without just cause or lawful excuse."

{44} But intent to delay, disrupt, or thwart ought to be required. It can and is to be found in an appropriate definition of "willful-

ly fails to appear." "Willfully" is not defined in Section 31–3–9. The *Masters* definition, while appropriate under the facts of that case, is too limiting and insufficient to apply to a case like the one before us now where a defendant may have carelessly failed to appear on time and disrupted a proceeding as a result. Unless "willfully" is defined in cases such as this to include an intent to delay, disrupt, or thwart, a defendant can be convicted for carelessness.

## BACKGROUND

{45} The facts are important. Defendant was released from custody on bond. He had a job. Working with his attorney, he spent many hours assisting in the preparation of his own defense. Defendant's wife Dorothy, a paralegal, together with his stepdaughter, participated also.

{46} Dorothy testified that she and Defendant believed that trial began at 9 a.m. That morning, Defendant went to his father's shop at 8 a.m. to set up the work assignments of the mechanics, to ensure that enough work was accomplished before his father's return from California after Thanksgiving. Showered and dressed in a white button-down shirt, a black tie, black boots, and a black vest, Defendant's appearance was much different than on a normal workday. Usually he went to work without showering in the morning and wore a blue coverall uniform, because he got very dirty at work.

{47} Dorothy began to be concerned at about 8:40 a.m. that Defendant had not yet returned from the shop to go to trial. Just before 9 a.m., Deputy Sheriff Waybourn arrived. Dorothy told the deputy that Defendant had gone to court or gone by the shop on the way to court.

{48} Deputy Waybourn called Judge Thrower at about 9:05 a.m. to say that Defendant was not at home and was presumably on his way to court. Then he sat in his car down the street to watch for Defendant's arrival. At some point, Dorothy's son warmed up their pickup truck so she could go to the nearest phone at Walmart, to check on Defendant, because their house had no telephone service.

{49} In the meantime, Defendant drove up. He was dressed for court and, according to Deputy Waybourn, "seemed to be in a hurry, to make it to court." Dorothy and her son joined Defendant in his car, calling out to the deputy as they left that they were on their way to court. The deputy followed them. On the way, he called Judge Thrower at 9:18 a.m. to say that Defendant was on his way to court.

{50} Unfortunately for Defendant, although Judge Thrower had informed the jury at 8:45 a.m. that they could expect another 45 minutes of waiting, the judge released the jury at 9:17, and issued a bench warrant for Defendant's arrest. Defendant and his family arrived at court between 9:18 and 9:26 a.m. As he was being arrested, Defendant told Deputy Waybourn that he thought the trial was set for 9 a.m. He knew he was a few minutes late, but "something came up." Dorothy testified "it was never [Defendant's] intention" to miss his day in court.

{51} Defendant was held without bail. He spent the next eight months in jail until he again was released on bond pending trial on the charge of failure to appear. He was convicted at trial of felony failure to appear under Section 31–3–9 and given a suspended sentence of 18 months and a mandatory eight-year habitual offender sentence. At some point (the reasons are not in the record on appeal), the original felony charge was dismissed.

## DISCUSSION

{52} No evidence was presented that Defendant was a flight risk. No evidence was presented that Defendant had a deliberate, conscious intent to be late to court in order to affect the court proceeding in any way.

{53} Defendant may have intentionally placed his work obligation ahead of his punctuality. He may well have acted recklessly. In fact, the jury might have believed Defendant had a deliberate, conscious intent to be late and thereby affect the proceeding. But the defect here is that, under the jury instructions, the jury was allowed to convict Defendant if his tardiness was due simply to bad judgment or carelessness.

{54} A trial court has unquestioned authority to command adherence by criminal defendants to its lawful orders through its contempt, bond revocation, and concomitant incarceration powers. The trial court has historically invoked those powers when a criminal defendant fails to appear on time for a scheduled arraignment, trial, or sentencing, particularly when the failure to appear on time disrupts the proceeding. The use of these powers is not conditioned upon a willful or even an intentionally defiant act; however, as a general proposition, the powers should not be invoked when a defendant can show "just cause" or a "lawful excuse" for the tardiness.

{55} A felony attribution raises tardiness to a different level of " 'moral condemnation and social opprobrium [for which] the crime should ... reflect a mental state warranting such contempt.' " *Magby,* 1998–NMSC–042, ¶ 10, 126 N.M. 361, 969 P.2d 965 (quoting *Santillanes v. State,* 115 N.M. 215, 222, 849 P.2d 358, 365 (1993)). I think the Legislature attached to Section 31–3–9 a much more significant role than to be a substitute for contempt or bond revocation. Section 31–3–9 requires a more serious level of behavior, a more specific level of intent.

### A. The Contempt Power

{56} Defendant's tardiness made him subject to contempt sanctions. *See* NMSA 1978, § 34–1–2 (1851); Rule 5–902 NMRA 2001. The contempt power derives from common law and is an inherent power of the court. *See State v. Clark,* 56 N.M. 123, 125, 241 P.2d 328, 329 (1952); *Purpura v. Purpura,* 115 N.M. 80, 82, 847 P.2d 314, 316 (Ct.App.1993). A court may impose a criminal contempt sanction for violation of a court order. *State v. Wisniewski,* 103 N.M. 430, 435, 708 P.2d 1031, 1036 (1985) (holding two district attorneys and two police officers in contempt for negligently failing to abide by discovery order in criminal case); *State v. Klempt,* 1996–NMCA–004, ¶ 1, 121 N.M. 250, 910 P.2d 326 (affirming criminal contempt against police officer for failure to comply with subpoena). The contempt power is "reserved to [the court] under N.M. Const. art. VI, Section 13," and "[the] sanction is intended to preserve the authority of and respect for the courts." *Wisniewski,* 103 N.M. at 434, 708 P.2d at 1035. Willfulness is not required. *Id.* A trial court can impose a jail term for contempt. Section 34–1–2.

### B. The Power to Revoke Bond

{57} "A trial judge indisputably has broad powers to ensure the orderly and expeditious progress of a trial. For this purpose, he has the power to revoke bail and to remit the defendant to custody." *Bitter v. United States,* 389 U.S. 15, 16, 88 S.Ct. 6, 19 L.Ed.2d 15 (1967). "The court on its own motion ... may at any time have the defendant arrested to review conditions of release." Rule 5–403(A) NMRA 2001; *Tijerina v. Baker,* 78 N.M. 770, 773, 438 P.2d 514, 517 (1968) ("[T]he court has inherent power to revoke bail of a defendant during trial and pending final disposition of the criminal case in order to prevent interference with ... the proper administration of justice[.]"); *accord State v. David,* 102 N.M. 138, 142, 692 P.2d 524, 528 (Ct.App.1984) ("[B]ail decisions may be reviewed at any time and for a variety of reasons."). Rule 5–403 gives broad latitude to the trial court to revoke and review the conditions of release of an accused "if circumstances arising after the initial release indicate the release should not be continued." *State v. Corneau,* 109 N.M. 81, 91, 781 P.2d 1159, 1169 (Ct.App.1989); *see, e.g.,* Crim. Form 9–212 NMRA 2001 (Bench Warrant); *State v. Dean,* 105 N.M. 5, 7, 727 P.2d 944, 946 (Ct.App.1986).

{58} The court may issue a bench warrant for the arrest of a defendant who violates its order. Rule 5–209(B) NMRA 2001; *see, e.g., Dean,* 105 N.M. at 7, 727 P.2d at 946. Revocation is proper even when the defendant "has not been charged, arrested, indicted or bound over for any crime allegedly committed while he was released." *David* 102 N.M. at 142, 692 P.2d at 528.

### C. "Willfully" Must Include the Element of a Specific Intent

{59} *Masters* states that " 'willfully,' as used in [Section 31–3–9] concerns [the] defendant's state of mind." *Masters,* 99 N.M. at 60, 653 P.2d at 891. Clearly, a defendant's

state of mind is material. Intent is a state of mind. The terms "just cause" and "lawful excuse" do not necessarily require a look into a person's state of mind.[1] That is why the definition in *Masters* is insufficient for a case such as that before us. That Defendant here had no just cause or lawful excuse for carelessly tending to his father's shop while the clock was ticking toward 9 a.m., and no just cause or lawful excuse for mistakenly believing that trial was at 9 a.m. rather than 8 a.m., does not mean that he intended at the same time to delay, disrupt, or thwart the criminal trial by being late.

{60} To say that this more specific intent is not an element to be proven is to read out of *Masters* the highly significant statement that "willfully ... concerns a defendant's state of mind." To disregard Defendant's state of mind, and thereby make irrelevant an intent to delay, disrupt, or thwart the criminal process by his failure to appear, and to depend solely on the "just cause" and "lawful excuse" elements of the *Masters* definition, is to place at felony risk every defendant in every criminal case who is minutes late for an arraignment, or sentencing hearing, much less for a trial because the defendant used bad judgment or was careless in failing to appear on time. That cannot be what the Legislature intended in enacting Section 31–3–9.

### D. The General Intent Instruction Did not Fulfill the Missing Element of Specific Intent

{61} The trial court gave the general intent instruction, UJI 14–141, over the State's objection. This instruction requires only an intent to do an act, where the doing of the act ends up causing harm, even if there is no specific intent to cause harm. This causal connection does not necessarily involve an intent not to appear or even be late. The

causal connection need be simply being at work knowing that a certain time deadline is required. Here, Defendant's decision to go to work, be at work, and return home before going to court caused Defendant not to be in court on time. The general intent instruction permitted the jury to convict on this basis.

### CONCLUSION

{62} The instruction defining "willfully," even with the general intent instruction, permitted the jury to convict Defendant for bad judgment or carelessness. These instructions would have permitted Defendant's felony conviction under Section 31–3–9 if the proceeding for which he failed to timely appear had been an arraignment. The Legislature could not have intended such a result, or have intended the result here, without proof of an intent to delay, disrupt, or to thwart the criminal process. Section 31–3–9 ought to be strictly construed, "requiring that both the letter and the spirit of the statute must be violated to eliminate the spectre of criminal laws subjectively applied or unwittingly violated." *Abdul–Musawwir*, 483 N.E.2d at 466 (referring to the application of a failure to appear criminal statute by the Indiana Supreme Court where the defendant was not advised by the court of his duty to appear at a specified time and place.).

{63} As stated in *Masters*, the state of mind of a defendant late for arraignment, trial, or sentencing is important. Willfully means more than doing an act without just cause or lawful excuse. For a felony failure to appear, willfully must also mean and require intent to delay, disrupt, or thwart the criminal process. That is when the conduct amounts to a felony. Being tardy due to carelessness or bad judgment should be punished, if at all, through the contempt sanction and revocation of bond. Defendant's failure

---

1. Note NMSA 1978, § 30–6–1 (2001) and UJI 14–602 NMRA 2001, construed in *Magby*, 1998–NMSC–042, 126 N.M. 361, 969 P.2d 965. Section 30–6–1(D)(1) outlaws a person "knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be ... placed in a situation that may endanger the child's life or health." The Legislature placed "intentionally" along side "without justifiable cause." In the present case, the *Masters* defini-

tion of "without just cause or lawful excuse" should be placed aside "willfully," or should be included within a fuller definition of "willfully," rather than be substituted for or constitute a complete definition of "willfully." "Willfully" should be construed as requiring a deliberate, conscious, and purposeful action to, at the very least, cause delay or disrupt the proceeding by not appearing on time.

to appear felony conviction and his habitual criminal mandatory sentence should be reversed because the jury may have convicted Defendant for carelessness or bad judgment.